Alright, we'll move to our second case this morning, which is Eli Lilly v. Arla Foods USA. Case number 17-2252. Mr. Oaks, whenever you're ready. Thank you, and may it please the Court, Michael Oaks, for the appellants Arla Foods, Inc. and Arla Food Production. This is an appeal from the District Court's grant of a preliminary injunction in joining Arla, a cooperative cheese producer owned by farmers around the globe, from continuing its advertising campaign promoting Arla's cheese products. The movement— Mr. Oaks, why have—hello. Why have you not directly challenged Judge Griesbach's holding that the advertising is misleading? Why have we not challenged that? I think— Directly. We could have challenged that, and I do think that it was an error, but I think the deference that Judge Griesbach gets in that, because of the other two errors are just complete failures of evidence on the part of ELANCO, we think that those are sufficient independently to have the entire preliminary injunction vacated. We don't think that they'll be able—they definitely did not prove it at the hearing, and we don't think they'll be able to prove it at trial, so we think that's sufficient for us here to have the injunction vacated. Now, Eli Lilly and ELANCO—I'm sorry, did I— I just want to ask you one other sort of, I guess, maybe bottom-line question, but why has Arla used the monster imagery and weird stuff language if not to suggest that consumers should be frightened or, at the very least, dubious of products made using the cows that have been treated with the artificial hormones? Yeah, I think it was an attention— You scared me! Well, Arla was founded over 100 years ago, and their philosophy for those 100-plus years has been clean, natural products, and so they are very into animal safety, not using hormones in the production of foods. That's sort of a signature trademark for them, and so it's a bit of an attention-grabbing device, but they were trying to be very clear that they don't use RBST. To most consumers who purchase dairy products, that is an important factor for them. Well, the ad campaign did not simply make that point in a positive way. It made that point by disparaging any dairy products that come from cows that were treated with this hormone. I mean, that's the whole point of this ad campaign. The point of the campaign— It's not just to say we're pure. It's to say those guys are impure and unhealthy and dangerous. Well, I mean, I think the voiceover, when you see the shift at the 22nd mark and the ad campaign, it makes it very clear what RBST is. RBST is a hormone given to some cows, not the cows that produce Arla cheese. And so they're trying to be very factual. There's no dispute that that statement is true. That's just a complete factual statement. It's informing the consumers to the extent that they don't already know what RBST is. This is what it is, and we don't use it. Right, but 90 percent of this ad campaign is disparaging any dairy products that come from cows that are treated with the hormone. Well, they don't mention—right, they don't mention other dairy. They don't mention competitors or cheese products. That's the whole point. What it did do is drive me further from milk and closer to whiskey, but go ahead. That was an interesting point that came out of the testimony, is that milk itself in the United States is essentially RBST-free, because consumers demand that. They don't want hormones used in the production of their milk. So the consumers have spoken, and they have slowly gotten the producers to move away from using RBST in milk. The remaining RBST—I guess milk from cows treated with RBST—is now put into some cheese products, not Arla cheese, and so that was the point. It's a differentiator. A lot of people are still using RBST in their cheese. Arla does not, and they want consumers to be aware of that. The district court made two serious and clear legal errors, though, in reaching its decision and entering the injunction. First, the district court found that the advertising was not literally false, and it found that it was not false by necessary implication. It's not a doctrine that this court has ever accepted, but Alonco has pushed that. But that was a factual finding by the district court that given the disclaimer, the FDA disclaimer in the commercial, the voiceover, the clear shift in tone, and the clear factual statement as to what RBST is, the district court made a factual finding that it was not literally false or false by necessary implication. Instead, the court found only that it was potentially misleading, but the district court failed to require Alonco to present any evidence that consumers were actually misled, and this court's jurisdiction is absolutely crystal clear, as is the jurisdiction in every other circuit court that has addressed this issue, that you must present evidence of actual consumer confusion. It has to be extrinsic evidence, not just the district court's subjective belief that somebody might likely be misled. The second... But we do have decisions from this court, like Abbott Laboratories, saying that evidence of actual consumer confusion is not required at the preliminary injunction stage. So why would the absence of such evidence, why would it be fatal to the preliminary injunction at issue here? So actually, what I read Abbott Labs to say is that a full-blown consumer survey is not required at the preliminary injunction phase, but evidence of consumer confusion is required at the injunction phase. So in the hot wax case that the district court cited and that both parties have cited, said the plaintiffs must demonstrate actual consumer confusion, and Avila v. Rubin case in this court also, if a court finds that a statement is only impliedly misleading, they can do so only if presented with evidence of actual consumer confusion. So it's not a subjective belief at the preliminary injunction phase. Why isn't the regulatory guidance enough evidence at this phase? So the regulatory guidance, first, is voluntary guidance. Second, it says that a statement that produced without RBST is potentially misleading if not placed in the proper context. The proper context is the FDA disclaimer, according to the FDA. Arla used the FDA disclaimer. In this tiny little fine print at the bottom. And the district court found that that disclaimer was enough as a factual matter to take them out of literal falsity and into this implied realm. Right, but that's a separate question of whether there is enough in the record to sustain the district court's finding of consumer confusion, because the judge did rely on that same evidence. He said it's not literally false, but it's misleading, and the regulatory guidance is evidence of its misleading nature. It's evidence of, but only on the misleading question, and we're not talking about the misleading question anymore. We're talking about consumer confusion, right? So it's potentially misleading. The guidance says that it's potentially misleading. Right. That's all part of the same inquiry, though. Sure. Because if you're not... But it's two parts. One, is it potentially misleading? And two, is there evidence of consumers actually being confused? And there's no evidence in the record... It seems to me that the federal and state governments, both, both of them have recognized the potential for confusion in advertising, suggesting that the products made without the use of RBST are materially different from those made with the artificial hormone. So doesn't that go at least some of the way to showing actual confusion? And to be perfectly honest, I don't know, anyone would notice that tiny little, that tiny little print. I mean, you're so, you're so interested in looking at the monster. So I think, I think the regulatory guidance gets you some of the way to misleading. It doesn't get you to actual evidence of consumer confusion, and that's really the issue here. The Seventh Circuit requires evidence of confusion. The FDA never looked at Arla's advertising. The state of Wisconsin never looked at Arla's advertising. And they never spoke to consumers and said, are you confused by this? Or can you look at the commercial in the full context of the commercial, which includes a disclaimer, which includes a voiceover, which explains what RBST is. And that has, you know, the full context of that. Is someone actually confused that this is a monster? And we don't know because Arla Elanco didn't present any evidence. If it's so egregious... At the preliminary injunction stage, consumer surveys aren't necessary. They're actually impossible to do because of the speed with which these Lanham Act preliminary injunctions need to be decided. So the district court relied on the regulatory guidance that in the absence of a conspicuous statement that there's nothing different between milk produced from treated cows and untreated cows that there is the potential for consumers to be misled. And in addition, there is evidence in the record that a major cheese producer is no longer going to be sourcing its milk from cows that are treated with the hormone because of, or at least in part because of, your advertisement campaign, which was, what, a $30 million campaign? Something like that? The full scope of it was to be. Now that it's been stopped, it's certainly not. Well, right. But that's what was planned. I mean, this was a major push to disparage competing cheese products that are produced from treated cows. So I think neither one of those two things... The district court relied on two things to find misleading and presumably a likelihood of success on confusion. One is, the district court just said, given the message the advertisement conveys, it's reasonable to conclude that consumers might be confused. The law is clear that you can't just substitute your own judgment in place of evidence. I mean, we cited... Well, right. But the judge was talking about the evidence in the record, which is the evidence about the statement from the major cheese manufacturer and the regulatory guidance, as I understand it, that was implicit, anyway, in the judge's ruling, even though he didn't... I would like to address the major cheese company. I won't say their name. But the issue... There's a number of problems with that as being evidence of consumer confusion. One, they are not the targeted consumers, and the test is whether or not the people to whom the advertising is targeted were confused. This cheese company was not confused, and... Right. That's not going to carry all the way to trial. There's going to have to be much more robust showing at trial, but... It's clear that the cheese company was not confused in any way, and they didn't base their decision on some survey of consumers who were confused by that. So they're not the target audience. They weren't confused. I'm sorry. How can you be certain of that? Have you had discovery on that? Well, Mr. Bishop, who was Elanco's witness, testified that the advertising was directed to retail cheese consumers, not to cheese manufacturers, not to dairy farmers, and not to Elanco's customers. So we know, we have an admission from Elanco on the record, that the targeted audience is retail cheese consumers. He said, you know, moms who watch the Hallmark Channel and Bravo, where this advertising was directed. So the test that this court has to decide is, is there evidence that those people were confused in any way? And it doesn't have to be a full-blown survey, but you need something, right? Well, if a major cheese manufacturer is concerned that its consumer base is going to be influenced by this ad campaign, and so it's going to change its business model to source its milk only from untreated dairies that use untreated, that have untreated cows, then, you know, it's not hard to connect those dots. But there's no evidence, right? I mean, the question is, what does the person to whom you advertise... I'm sorry. You know, there's... Yes, right. I caught the lag that time. But, I mean, what could have more of an impact on the consumer? I'm sorry. What could have more of an impact than a major cheese company, I'll go to sleep wondering which one it was, it's going to stop using this product. I mean, then the consumers won't have to be confused. They won't have a choice. I suppose you're right, but, again, that's not evidence of consumer confusion. The cheese company is not confused in any way. They know exactly what RBST is. They've been using it for decades. What was the whole point of the $30 million ad campaign if you didn't want to affect consumer behavior? Why is that not evidence, at least at the preliminary injunction stage? It's not evidence of deception. That's the question. It's not evidence of deception. And, of course, they wanted to get their message out. The message that this hormone is dangerous to cows and the milk is dangerous for human consumption. That's the whole idea with the monsters and the dragons or whatever they were. The idea of the cartoon was to grab the consumer's attention. The remainder of the commercial is to explain what RBST is and make it clear that Arla doesn't use RBST. Because it's dangerous. Because they don't believe in it. As a company, it's part of their philosophy. It's unhealthy. It's unwholesome. You should not feel good about feeding these products to your children. They never said no one else. I think Arla and the judge was clear that Arla can say you can feel good about feeding Arla to yourself. They never came out and said you should not feel good. You may take that impression. Somebody could take that impression. How else but a monster will get you? Oh my gosh. Alonco had five weeks from the time that this advertising was filed to find some consumer out there. They said that they needed evidence that 15% of the consumers were led into this decision. They didn't find a single person. I don't know. They could have done focus groups. They could have presented, like in the Abbott Labs case, they could have presented anecdotal evidence of consumers who were confused. Anything. They could have come forward with some evidence. There's zero evidence in the record that a single consumer was confused. It is not for the district court judge and it's not for this court to substitute their judgment as to the messaging for an impliedly misleading claim in place of evidence. There's no case anywhere that would allow the court to do that. You're into your rebuttal. I'm into my rebuttal, so I will cross. Thank you. May I proceed, Your Honor? Please. May it please the court. Steve Zalesin for Eli Lilly and Alonco. As the court is well aware, this is an appeal from a grant of a motion for a preliminary injunction and when you have a motion for a preliminary injunction, there are four factors that the district court is obliged to weigh. One, likelihood of success. Two, irreparable injury to the moving party. Three, the balance of hardships. And four, the public interest in the outcome of the dispute. And here, ARLA has only challenged the first finding. There's been no appeal from any of the second, third, or fourth factors. And then, with respect to the first factor, likelihood of success, we have this court's very clear jurisprudence from as recently as last year in the DU Rhodes case, which says that the bar or the standard for determining likely success on a preliminary injunction is low. Here's the actual language. Quote, the threshold for demonstrating a likelihood of success on the merits is low. In framing the probability of success necessary for a grant of injunctive relief, we have said repeatedly that the plaintiff's chances of prevailing need only be better than negligible. So that's what the... Mr. Salzin, I will grant you that ARLA wants the viewer to be dubious of, maybe even fearful of, products made using milk from RBST-treated cows. But in that respect, this advertising seems very much of a piece with a lot of advertising regarding all natural, antibiotic-free, and organic products these days. How is this materially different from the advertising that touts products that are all natural or free of ingredients, you know, that I, for one, can't pronounce? Right. Your Honor, the actually, the record in this case addresses that very question. In his testimony at the preliminary injunction hearing, Elanco's witness, Mr. Bishop, explained that this particular ad or this ad campaign was different from anything that Elanco had ever seen in this industry in that it did not merely state, as for example, pretty much every milk carton in America states somewhere, RBST-free or made without cows treated with the RBST hormone. It chose to make that the focal point, the centerpiece of an entire ad campaign, dramatizing and depicting as a deadly monster that with razor-sharp horns and electric fur, this hormone, which has been repeatedly found by every global scientific body, to be perfectly safe. So it is not simply... Well, just as you noted, the monster imagery is so over the top. I mean, it is so over the top. Wouldn't a reasonable consumer appreciate that this is just a type of puffery? I mean, do you think that a reasonable consumer really thinks this is some monster? No. And the district court found, I think correctly, that a reasonable consumer would not think that RBST is actually a monster. But what a reasonable consumer would think, and we think the evidence clearly shows, is that there is something dangerous or unsafe or unwholesome or certainly undesirable that you should be dubious or suspicious of about RBST. And I should say that when that commercial, after 20 seconds of telling this monster story about how it's weird stuff and it's dangerous and deadly, when it suddenly changes for the last 10 seconds to the sunlit room and the happy announcer, and the announcer says actually RBST is an artificial hormone given to some cows, that is in no way inconsistent with the idea that that hormone is not good for you. It's undesirable, it's unsafe, it's dangerous. And that was the whole point of this ad campaign, as I think everybody in this room basically knows. There's never, to this day, been any explanation provided by ARLA why it chose, of all the children who it interviewed... Actually, it looks like a political campaign. Well, if it were a political campaign, they might get away with it because of the heightened First Amendment protection, but we're dealing here with pure political speech, and you cannot do a hatchet job on somebody who is within the protection of the statute, as Elanco is the only seller in America of this product, clearly is, and get away with it. And perhaps they didn't expect that Elanco would come after them, but this is the family jewels for Eli Lilly and Elanco. It is one of their best-selling products, they have a lot invested in it, they are the only purveyor, and they clearly have a lot at stake here. And so, just to... If we had doubts, if we had doubts about whether this advertising is misleading, as Judge Griesbeck thought it was, then would that be the basis for us to say that some proof of actual confusion is necessary in this case, even if it might not always be required to sustain a preliminary injunction? So, the question, the square question here is, was the district court's fact-finding that the ad campaign is likely to deceive consumers, was that fact-finding clearly erroneous? And to be clearly erroneous, it has to be that it's a high standard, obviously, and the court cited a variety of types of evidence, and I want to make one legal point that's very important. There is no requirement in this court's jurisprudence or elsewhere that there be proof of actual consumer confusion, even at the final trial stage, certainly not at the preliminary injunction stage. The question is, are consumers likely to be deceived or likely to be confused by the advertising or the campaign? And that can be measured or evaluated through a variety of types of evidence, one of which is proof of actual confusion in the marketplace, which is actually very rare to come by. Surveys, the types of so-called full-blown surveys that the Abbott case talked about in 1992 are not evidence of actual confusion, they're evidence of likely confusion because these are consumers who were recruited to review an ad and give their opinions about what message it's conveyed. These are not consumers who were actually confused into making a purchase they didn't intend to or on a basis they didn't properly understand. So the types of evidence... Well, the advertising does disclose what RBSD is, and it does include the FDA's disclaimer that there is no significant difference in the products. So, let's see, to the extent the advertising suggests that consumers should prefer for intangible reasons, no weird stuff, the product made without using artificial hormones, why isn't that fair game? And wholly typical in present-day ads for these all-natural products. Again, Your Honor, for example, we did not challenge at the preliminary injunction stage certainly the statement on Arla's packaging that there are no added hormones in the product. If that's all they did is state the fact that the product was made from cows that were not treated with RBSD, we wouldn't have this lawsuit. But that isn't what they did. They dramatized the message through this imagery of a dangerous monster and made it the focal point of their campaign. And to the point about the disclaimer, as the District Court found, it's very small, as I believe Your Honor observed, it's barely legible. We're talking about watching a television screen on a crowded screen. It goes by, there's never been any challenge to our assertion that that disclaimer is not legible to the typical consumer. And so my answer to that is that does nothing whatsoever except serve in a way as an admission that the advertiser knew all along that the message it was communicating was false. So would it be okay if that sentence was placed in bold across the TV ad? I doubt it because the law is that you can't use a disclaimer to contradict what is otherwise a clear false message in a commercial. So you can't say one thing and then say just kidding. A clear false message. A monster? This is a clear message? There are such beings? No, again, we never contended that the typical or any consumer really would take away the message that RBST is truly a monster. What we contended, and we still contend, is that the monster is a metaphor for something that is dangerous or to be avoided or somehow something of which you should be dubious. And the intent here, which by the way was never rebutted at trial by any Arla witness, is set forth in the record. There was no finding on this because I guess Judge Griesbach didn't think he needed to make a finding on intent. But there's a behind the scenes video in which the little girl whose drawing was the inspiration said that she intended to show that it's very dangerous. The press release that announced this campaign, the $30 million campaign, says that Arla wants people to understand that you can have, quote, better for you products that still taste great and this is one of them because it doesn't use RBST as an ingredient or other weird stuff. So there's a clear intention here and Arla did not present any live testimony at the preliminary injunction hearing. It put in a declaration from its chief executive who did not deny what we asserted in our moving papers, which is that there is a clear intent here. And he said he couldn't be at the hearing. I'm sorry, Your Honor. Is the little girl your average consumer? We'll be confused. No, that's not the point. It's her mom who's the average consumer, but the little girl's intent, which was brought to life by Arla's cartoon animators, was to communicate that RBST is, quote, very dangerous and that's exactly what they did. It's not her intent that counts. I understand that, but Arla was telling her story and it animated a story about a monster which was intended to and does in fact illustrate a false point that RBST is, quote, very dangerous. So again, it's the chief executive or the marketing people's intent that matters and that is actually documented in video, behind the scenes videos from the ad agency. We asked kids because we knew that they had no idea and forget about what a boardroom full of marketing execs will say. Let's ask kids. They won't mince words when being asked what they think these so-called ingredients are, even though they're not ingredients. And Your Honor, Mr. Storer, their CEO, couldn't be bothered to show up at the preliminary injunction hearing, even by telephone, as Your Honor is appearing here today, because he had a so-called all-hands conference call. He was too busy that day. I think it's easy to- Maybe he's not as hygienic as I am. Well, just a voice call would have sufficed, but I was denied that opportunity. In any event, we believe there was plenty, plenty of evidence on which for the district court to base its finding that this ad is likely to mislead a non-insubstantial portion of consumers. And I haven't talked about the regulatory framework yet, but as it was noted, both the district court and I recognize that ads like this that call out or focus on the fact that a dairy product is derived from a cow that was not given RBST, that there's a tendency for advertising like that to be deceptive, and that an advertiser has to be careful and take steps not to mislead or confuse consumers when it does so. And that is, I think, this is not an idea that either Eli Lilly or Judge Griesbach made up out of whole cloth that you can confuse or deceive consumers with advertising like this. It's something that's been recognized by regulatory authorities. There were anecdotal reports in the record of consumers complaining to ARLA on its social media pages that these ads were, quote-unquote, fear-mongering. That doesn't count for much. Well, it's a preliminary injunction. So that's what you get at this stage, Your Honor. I'm sorry, Your Honor? ARLA seems to think that there are fatal hearsay problems with your proof as to any injury caused to Ilanco by the advertising. So maybe you could address that. Sure. So all we have to do is prove a likelihood of injury. In fact, we proved an actual injury in that there was a major cheese producer that chose to discontinue use of RBST among its, it would no longer accept milk from cows that had been treated with RBST. And this isn't something that is in doubt. For example, in Ilanco's separate appendix at page 263, we included a letter from AgriPure, which is one of the major dairy producers, milk aggregators, sources milk from dairy farmers and then sells it on to people like the major cheese producer in question. And it says right here, quote, we have recently been notified by a large customer that they will require the cheese that they buy from us to be RBST-free very soon. And we have no choice to, so there's no doubt that this happened. The only issue is really the attribution of the decision by the major cheese producer to this ad campaign, at least in substantial part. And on that score, there was a business, the testimony was that there was a business meeting, not attended by our witness, Mr. Bishop, but attended by people working for him. And at that business meeting between Ilanco's representatives and the major cheese producer's representatives, it was shared with Ilanco and then immediately reported in a business record memo up the chain, including to Mr. Bishop, that this decision had been made and it was based in substantial part on Arla's ad campaign, which was disparaging RBST. And as to whether that's evidence of injury, it's also evidence of likely confusion. A major cheese producer like this one surely knows its customers and knows that when technology like RBST is under attack and being portrayed as somehow unsafe or undesirable, its customers are going to look at that and choose other cheese products if they're available. And that's why it made the decision. It didn't say it was doing it for economic reasons, said it was doing it because of concerns about public opinion, which Arla's own expert witness, Dr. Ahn, A-N, submitted a declaration that in his research, negative public opinion about RBST is one of the main reasons why dairy farmers, when they choose to, quote unquote, disadopt, why they make that decision. A lot of that research is in the public domain, too. This debate's been going on for decades. It has been going on for decades, and this is not the first time that someone, that there's been a suggestion that there's a safety issue or something less wholesome or less desirable about dairy products sourced from these cows that have been treated. And every single time this has come up, it has been rejected by the scientific and regulatory community. It was an unfair and deceptive trade practice for Arla to attempt to introduce itself and suggesting that its products are better, superior, more wholesome, healthier, safer for you because they're not made with milk from RBST-produced cows, and there's plenty of evidence to affirm the injunction. I'm sorry? And the federal and state guidance is explicitly based on that history, as I read it. That is absolutely right. So as far back as 1994, when FDA first approved RBST, it foresaw that this issue could come up, that the mere suggestion that there's an advantage or a benefit to being quote-unquote RBST-free could suggest erroneously that there's a quality difference, and they warned advertisers about it. And the state of Wisconsin, in language, by the way, which is identical to the district court's injunction, said you can't directly or by implication imply that there's a compositional quality or safety difference between milk from one cow versus the other based on whether they were treated with this hormone. Unless there are other questions, I thank the Court for its attention. Thank you. Thank you. Mr. Oaks. Thank you. I'd like to address a couple of points raised by Mr. Zaleson. He suggested that the burden is extremely minimal on a preliminary injunction hearing. The Supreme Court in 1997 in the Maseret case said the movement must satisfy a requirement of substantial proof at a preliminary injunction phase that is much higher than summary judgment. So it's not that you can come forward with no evidence of confusion or causation like they've done here. The burden is even higher than it is at summary judgment. He also suggested that in the Seventh Circuit, you can show consumer confusion without any evidence even at trial. There is no case in the Seventh Circuit that suggests you can show evidence of consumer confusion at the preliminary injunction phase or at trial without evidence of consumer confusion. I think the distinction was evidence of actual confusion versus likelihood of confusion. So the Avila case actually says those words exactly. A court can find it impliedly misleading only if presented with evidence of actual consumer deception. So you actually have to show consumers who are the targeted audience were deceived by the ad. The cases usually speak in the alternative. I know that there's language that seems to suggest that only proof of actual confusion is sufficient, but the elemental requirement of the doctrine is usually likelihood of confusion. Actual evidence of actual confusion will suffice, obviously, but it's not necessary. I haven't seen any court, any decision from this court where they said, well, we're going to give you an injunction. Be careful. You may find one. Heck, I couldn't find any, and they didn't cite any, so I'll say that. They didn't cite any, and the district court didn't cite any in its opinion, so I haven't seen any. Yeah, but legal standard is likely to confuse a substantial portion. As supported by evidence, right? There's just the evidence is what's lacking as to how consumers would perceive this ad given the entire context of the ad that we've talked about. The other issue that was just brought up is the causation issue. We didn't talk about it too much in the beginning, but Lexmark requires that it flows, that the injury alleged flows directly from the deception. Again, this intermediate cheese manufacturer is not deceived, so the injury, and the court said it, Mr. Bishop said it, it's in the decision. The injury chain here would be the longest injury chain ever supported by any decision that the plaintiff cited, that the district court cited. So it's a five-step injury chain between cheese consumers to cheese manufacturers to producers to dairy farmers to a long go. Right, but the dots are very easy to connect here. This is not like Mrs. Paul's graph. If the dots were so easy to connect, it should have been easy for them to come forward with some evidence. They completely failed on at least two of the steps. One is step one, the consumer confusion that we've talked about, and then the final step where Elanco's direct customers have said, we're not going to buy RBST, we're not going to buy PASLAG from you anymore. Again, we've got one person in the middle saying, we're not going to do, we're not going to use RBST in our cheese, but they can source from anybody else who's already not using RBST like most dairy productions aren't. So they can go source from someone else. It doesn't mean that Elanco's customers, their direct customers, who are the dairy farmers, are stopping using this. They could have gotten some evidence. They could have gone to their customers and said, hey, is this going to have any impact on you? They had five weeks to do it. They were thinking about litigation from day one, and that evidence shows that in their emails. So they could have gone and just asked their customers or had one of their customers show up and say, hey, this really impacts me, and I'm going to stop buying PASLAG. They didn't put any evidence in. This is a case about evidentiary failure. At the preliminary injunction phase, the evidentiary standard is higher than it is at summary judgment, and they didn't come forward with the evidence. They could have done it. They had time to do it. It wasn't like a TRO hearing where they literally only had two days. They had five weeks. They had all these meetings. They went out and met with the cheese producer. They went out and they had internal meetings about coming up with litigation strategy. So they had time to put together their case, and they didn't get the evidence. And so for the preliminary injunction, they'll have their chance at trial to go get that evidence. There's plenty of time. But the injunction without evidence cannot be sustained, unless there are any other questions. Thank you for your time today. Apparently not. Thank you. Our thanks to all counsel. The case is taken under advisement, and the court